

I N   T H E

# Court of Appeals of Indiana

Alexander R. Irwin,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Feb 28 2024, 8:35 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

February 28, 2024

Court of Appeals Case No.
23A-CR-501

Appeal from the Wayne Superior Court

The Honorable Gregory A. Horn, Judge

Trial Court Cause No.
89D02-2106-F2-000011

**Opinion by Judge Felix**
Judge Bailey concurs with separate opinion.
Judge May concurs in result with separate opinion.

**Felix, Judge.**

## Statement of the Case

[1] Alexander R. Irwin was convicted of dealing in cocaine, dealing in a narcotic drug, and dealing in methamphetamine. Irwin presents two issues on appeal, which we restate as follows:

1. Whether the trial court abused its discretion when it admitted security camera footage into evidence; and
2. Whether the trial court abused its discretion when it refused to give Irwin's proffered jury instruction.

[2] We affirm.

## Facts and Procedural History

[3] In the spring of 2021, Detective Chase Patton of the Wayne County Drug Task Force received three anonymous tips about Irwin dealing drugs out of his apartment in Richmond, Indiana. As a result, Detective Patton began conducting surveillance on the apartment.

[4] At the time, Kacey Lawrence was dating Irwin and living with him at the apartment. On May 17, 2021, Detective Patton observed Lawrence leave the apartment and get into a vehicle with an individual he recognized from past drug investigations. Since Detective Patton was conducting surveillance in an unmarked vehicle, he called a patrol officer to follow Lawrence in the vehicle, and that officer conducted a traffic stop. The officer found Lawrence with a bag of methamphetamine, and Lawrence told law enforcement that Irwin was

dealing drugs out of the apartment. The officer arrested Lawrence for possession of methamphetamine.

[5] During the three weeks Detective Patton conducted surveillance on the apartment, he observed an "uncommon amount of visitors" coming in and out of the back entrance. On two occasions after Lawrence's arrest, Detective Patton asked patrol officers to follow the vehicles of visitors who he observed leave the apartment. In both instances, officers conducted a traffic stop and found the passengers to be in possession of methamphetamine. Thereafter, Detective Patton applied for a search warrant on the apartment to search for and seize illegal drugs.

[6] On June 2, 2021, law enforcement executed the search warrant. The officers found Irwin on the back porch of the apartment with $4,500 in cash and three bags of narcotics on his person. Law enforcement found Lawrence inside the apartment and began questioning her. Lawrence told police where firearms and narcotics could be located. In the apartment, officers found narcotics, methamphetamine, firearms, syringes, baggies, and a digital scale. Irwin was arrested and charged with dealing in cocaine, a Level 2 Felony;[1] dealing in a

---

[1] Ind. Code § 35-48-4-1(e)(1).

narcotic drug, a Level 2 Felony;[2] and dealing in methamphetamine, a Level 2 Felony[3].

[7] During Irwin's arrest, Lieutenant Chad Porfidio met with Irwin's landlord to retrieve security camera footage from the property. The building had a security camera facing the back entrance to the apartment, and the landlord kept the video recordings saved on a computer. Lieutenant Porfidio downloaded footage from the camera for the 30 days leading up to Irwin's arrest onto a hard drive and collected it for evidence. Detective Patton reviewed the entire video, highlighted the relevant excerpts of footage, and took notes on those excerpts.

[8] At trial, the State offered the relevant excerpts of security camera footage (the "Security Footage") into evidence. Initially, the State attempted to authenticate the Security Footage through Detective Patton's testimony about reviewing the video in its entirety. Irwin objected, and the trial court sustained the objection. Later, the State presented testimony from Lieutenant Porfidio to authenticate the Security Footage. Lieutenant Porfidio testified about his familiarity with security camera systems like the one used at the apartment, and he testified that the Security Footage had not been altered. Irwin renewed his objection, and the trial court admitted the Security Footage over his objection.

---

[2] *Id.*

[3] *Id.* at § 35-48-4-1.1(e)(1).

[9] After the State rested its case, Irwin planned to call Lawrence to the witness stand to testify. At the time, the parties and the trial court were aware that, if called to testify, Lawrence intended to invoke her Fifth Amendment privilege against self-incrimination, so the court excused the jury from the courtroom prior to Lawrence's testimony. During direct examination, Lawrence responded to each question asked of her by invoking her Fifth Amendment privilege to remain silent.

[10] Following Lawerence's testimony, the jury returned to the courtroom and Irwin rested his case. Prior to closing arguments, Irwin requested the trial court to instruct the jury that Lawrence took the witness stand and invoked her Fifth Amendment privilege. The court denied the proposed instruction. The jury found Irwin guilty as charged, and Irwin now appeals.

## Discussion and Decision

### 1. The Security Footage Was Properly Authenticated and Admissible

[11] Irwin argues that the trial court erred in admitting the Security Footage without proper authentication. We review the admission of evidence for abuse of discretion. *McCallister v. State*, 91 N.E.3d 554, 561 (Ind. 2018). "We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it." *Id.* (quoting *Knapp v. State*, 9 N.E.3d 1274, 1281 (Ind. 2014), *cert. denied*).

[12] The State offered the Security Footage under the silent-witness theory. Videos and photographs are often offered as demonstrative evidence, but, under the

silent-witness theory, they are offered as substantive evidence. *Knapp*, 9 N.E.3d at 1282. "Evidence offered for substantive purposes acts as a silent-witness[ ] as to what activity is being depicted whereas evidence offered for demonstrative purposes is merely an aid[] that assist[s] in a human witness's testimony." *Kirby v. State*, 217 N.E.3d 575, 583 (Ind. Ct. App. 2023) (quoting *Knapp*, 9 N.E.3d at 1282) (internal quotation marks omitted). When videos or photographs are admitted as substantive evidence, "the foundational requirements . . . are vastly different from the foundational requirements for demonstrative evidence." *Smith v. State*, 491 N.E.2d 193, 196 (Ind. 1986). The foundation for videos or photographs as demonstrative evidence requires testimony that the evidence "accurately depict[s] the scene or occurrence as it appeared at the time in question." *Id.* The foundation for the admission of videos or photographs as substantive evidence requires "a strong showing of authenticity and competency, including proof that the evidence was not altered." *McCallister* 91 N.E.3d at 561–62 (citing *Knapp*, 9 N.E.3d at 1282).

[13] To properly authenticate a piece of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). "In order to authenticate videos or photographs using the silent-witness theory, there must be evidence describing the process or system that produced the videos or photographs and showing that the process or system produced an accurate result." *McFall v. State*, 71 N.E.3d 383, 388 (Ind. Ct. App. 2017) (citing Evid. R. 901(b)(9)). Surveillance video footage may be properly authenticated and admissible under the silent-

witness theory when the proponent presents "testimony from someone with knowledge on the security system that produced the video or image, on the integrity of the system's process, and on whether [the] video or image was altered." *Stott v. State*, 174 N.E.3d 236, 246 (Ind. Ct. App. 2021).

[14] First, we note that, at trial, Irwin did not object to the admission of the Security Footage on the grounds raised on appeal. Irwin objected to the admission of the Security Footage arguing that the business records exception applied, and Lieutenant Porfidio had not viewed the footage; he did not mention the silent-witness theory or its foundational requirements in his objection. "[A] defendant may not object to the admission of evidence on one basis at trial and then raise a different basis on appeal." *Ward v. State*, 203 N.E.3d 524, 531 (Ind. Ct. App. 2023) (citing *Bradfield v. State*, 192 N.E.3d 933, 935 (Ind. Ct. App. 2022)). Thus, this evidentiary argument is waived. *Id.*

[15] Waiver notwithstanding, the State provided sufficient evidence to authenticate the Security Footage. Lieutenant Porfidio testified about his familiarity with the type of security system used at the apartment and his conversation with the landlord. The testimony provided that: (1) the security system was located in a locked room; (2) the landlord was the only person with access to that room; (3) the landlord did not alter the footage; (4) Lieutenant Porfidio downloaded the Security system on the day of the arrest; and (5) there was no way the Security Footage could have been manipulated when Lieutenant Porfidio downloaded it from the security system. The State provided the foundation to demonstrate the

Security Footage was authentic and unaltered. We hold that the trial court did not abuse its discretion by admitting the Security Footage.

## 2. The Trial Court Did Not Abuse Its Discretion by Rejecting Irwin's Proposed Jury Instruction

[16] Irwin argues that the trial court violated his Sixth Amendment right[4] to a complete defense when it rejected his proffered jury instruction. We review the trial court's decisions regarding jury instructions for abuse of discretion, *Miller v. State*, 188 N.E.3d 871, 874 (Ind. 2022), including "the court's refusal to give a tendered instruction," *Elmer Buchata Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 944 (Ind. 2001).

[17] We review alleged federal constitutional errors de novo. *Zanders v. State*, 118 N.E.3d 736, 740 (Ind. 2019). "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *In re Crisis Connection, Inc.*, 949 N.E.2d 789, 800 (Ind. 2011) (quoting *Kubsch v. State*, 784 N.E.2d 905, 923–24 (Ind. 2003)). However, this right does not guarantee a defendant every defense imaginable. *See Marley v. State*, 747 N.E.2d 1123, 1132 (Ind. 2001). In presenting a defense, "[t]he accused, as is required of the State, must comply with established rules of procedure and evidence designed to

---

[4] Irwin alleges a violation of the Indiana Constitution. Appellant's Br. at 14. His argument, however, lacks any citations or cogent reasoning related to his state constitutional claim in violation of Indiana Appellate Rule 46(A)(8)(a). We therefore consider this argument waived and decline to address it. *See Davidson v. State*, 211 N.E.3d 914, 925 (Ind. 2023).

assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* (quoting *Roach v. State*, 695 N.E.2d 934, 939 (Ind.1998)).

[18] The trial court rejected Irwin's proposed jury instruction concerning Lawrence invoking her Fifth Amendment privilege on the witness stand. Our Supreme Court has recognized that "defendants do not have a right to force a witness to invoke the Fifth Amendment privilege before the jury." *Stephenson v. State*, 864 N.E.2d 1022, 1047 (Ind. 2007) (citing *United States v. Castorena-Jaime*, 285 F.3d 916, 931 (10th Cir. 2002)). Additionally, once that privilege is invoked outside the presence of the jury,

> (1) Neither the judge nor counsel may comment upon the claim of a privilege . . . . No inference may be drawn from the claim of a privilege.
>
> (2) In jury cases, the judge, to the extent practicable, must conduct proceedings so as to allow parties and witnesses to claim privilege without the jury's knowledge.

Evid. R. 501(d)(1)–(2).

[19] Irwin asked the court to instruct the jury that "[w]hen questioned, Kacey Lawrence invoked her right to [sic] self-incrimination and refused to answer any questions posed to her." Tr. Vol. III at 117. Irwin intended for the jury to infer Lawrence's culpability in furtherance of his theory that the drugs in the apartment belonged to Lawrence. The purpose of this instruction conflicts with the protection afforded to privilege in our rules of evidence. *See* Evid. R. 501(d)(1).

[20] Irwin relies on our decision in *Martin v. State*, 179 N.E.3d 1060 (Ind. Ct. App. 2021) for his claim that "the trial court was not permitted to deny" his requested jury instruction, Appellant's Br. at 14, but this argument is unpersuasive. In *Martin*, we suggested the types of circumstances that could permit a trial court judge to decide to allow a witness to be called to the stand even though that witness was expected to invoke the right to remain silent. 179 N.E.3d at 1068. We said that "[s]uch a witness might be an occurrence witness who is needed to provide foundational facts as to the circumstances surrounding an event. The witness might make an identification or offer some corroboration of a fact in issue." *Id.* Here, neither of these circumstances were argued to the trial court judge nor on appeal. The types of circumstances where such a witness could be called to the stand even though the witness is expected to remain silent are not applicable in this case. However, even if they were, since "[t]he trial court has broad discretion as to how to instruct the jury," *McCowan v. State*, 27 N.E.3d 760, 763 (Ind. 2015) (quoting *Kane v. State*, 976 N.E.2d 1228, 1231 (Ind.2012)), we hold that the trial court did not abuse its discretion in denying Irwin's proffered jury instruction.

[21] Affirmed.

Bailey, J., concurs with separate opinion.

May, J., concurs in result with separate opinion.

ATTORNEYS FOR APPELLANT
Jessica L. Richert
Richmond, Indiana

Josiah J. Swinney
Fishers, Indiana


Attorneys for Appellee

Theodore E. Rokita
Indiana Attorney General

Courtney L. Staton
Deputy Attorney General
Indianapolis, Indiana

**Bailey, Judge, concurring.**

[22] I, like my colleague, concur in full with the majority's analysis of the jury instruction issue. As to the admission of the Security Footage, I agree with the majority's conclusion that Irwin waived the particular issue presented on appeal for failure to raise that issue in the trial court. "A party may not object on one ground at trial and raise a different ground on appeal." *White v. State*, 772 N.E.2d 408, 411 (Ind. 2002). That alone would be sufficient to resolve this issue yet because my colleagues have chosen to address the evidentiary issue on its merits, I feel compelled to write separately.

[23] I also agree with the majority that, notwithstanding Irwin's procedural default, the State provided an adequate foundation for the admission of the Security Footage. It may have been desirable to call as a witness the landlord (who was more familiar than the officer with the security system) and question the landlord as to the recording system's historical performance. But the omission of this particular witness is not fatal. "Absolute proof" of the authenticity of an item of evidence is not required. *Richardson v. State*, 79 N.E.3d 958, 962 (Ind. Ct. App. 2017), *trans. denied*. When the sponsoring witness adequately described the recording system and showed that it produced an accurate result, it became a matter of weight as opposed to admissibility of the evidence.

[24] Additionally, I disagree with the suggestion that the reasoning of *Kirby v. State*, 217 N.E.3d 575 (Ind. Ct. App. 2023) amounts to a watering down of the

authentication threshold. Upon review of the record, the *Kirby* Court found it to be "unlikely that the video was, or could have been, altered during this time period," which was the "time elapsed between the recording of the arson and the detectives' viewing of the video." *Id.* at 588. And in *Kirby*, as in this case, there was substantial evidence of guilt independent of the video:

> [T]he video's depiction of the arson was corroborated by other evidence: Lindsay's 911 call placed Kirby and Brandon at the house, and Lindsay described Kirby as shirtless and wearing shorts. On the same day as the fire, law enforcement recovered jean shorts and white shoes on which gasoline was identified from Brandon's house. Finally, at the suppression hearing, Amber testified that Kirby often came over to Brandon's house and that it would not be unusual to find Kirby's clothing there, and Detective Jones testified that Brandon and Kirby shared clothing and that the white shoes belonged to Kirby.

*Id.* at 588.

[25] I do not disagree that, in this technological era, potential for digital manipulation exists, but it does not exist in this case. I whole heartedly agree that the proponent of evidence must comply with Evidence Rule 901(a):

> To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

I believe that here the State produced sufficient testimony to authenticate the Security Footage and to convince the trial judge, as gatekeeper, that the evidence should be admitted. Once the proponent met its burden to support

admissibility, the opponent had the opportunity to challenge both the foundational support for admission and introduce any evidence of manipulation. But any such challenge was unsuccessful in this case. And at that point it becomes a matter of weight rather than admissibility of the evidence.

[26] Certainly, the jury, once given a particular exhibit, can factor into its evaluation the common knowledge that digital manipulation is possible; but of course, if the exhibit was found by the gatekeeper to be altered or manipulated, it would be totally excluded from their view. As in *Kirby*, here the State adequately dispelled concerns of distortion or manipulation. Ultimately, the quality of the evidence was adequate to establish a foundation. The jury was then free to weigh the evidence. I am not persuaded that the trial court, in its role as gatekeeper, abused its discretion.

[27] For these reasons, I concur.

**May, Judge, concurring in result.**

[28] I concur in full with the majority's analysis of the jury instruction issue, but I must concur in result only with the majority's handling of the admission of the Security Footage. My reading of the transcript leads me to conclude Irwin did not waive his silent-witness theory objection to the admission of the Security Footage during Lieutenant Porfidio's testimony, and I do not believe the Security Footage could have been sufficiently authenticated by Lieutenant Porfidio to be admissible under the silent-witness theory. Nevertheless, I believe admission of the Security Footage constituted harmless error, and I therefore concur with the majority's affirmation of Irwin's convictions.

## 1. Waiver

[29] First, I disagree with the majority's conclusion that Irwin waived his argument regarding admission of the Security Footage by advancing a different argument on appeal than he made before the trial court. At Irwin's trial, the State initially offered the Security Footage into evidence while questioning Detective Patton. Irwin stated: "Judge, I'm going to object. These are essentially business records of the landlord and he's not [here] to authenticate that. There's no business records of [sic] affidavit, so on that ground I'm going to object." (Tr. Vol. III at 33.) The State responded to Irwin's objection by asserting: "I believe that the silent witness theory of admissibility is applicable to this particular video." (*Id*.) The trial court then ruled:

Well, I would have to agree with – I understand the State's position, but even under the silent witness theory, we have to have some authentication and here the camera is under the control of the landlord presumably. He's not here to testify. We've got [sic] no testimony that it was presented unaltered from the landlord to Officer Patton's boss and then to him. Without that sort of authentication, I'm not going to permit it. Also, when you say that Officer Patton observed, he did observe periodically, but I don't recall him testifying that he observed everything that is in the video.

(*Id*. at 33-34.) While the majority asserts that Irwin "did not mention the silent-witness theory or its foundational requirements in his objection," (Maj. op. at ¶ 14), the trial court specifically addressed the Security Footage's admissibility under that theory in initially sustaining Irwin's objection during Detective Patton's testimony.

[30] When the State offered the Security Footage for a second time while questioning Lieutenant Porfidio, Irwin objected on the basis that Lieutenant Porfidio had not personally reviewed the exhibit to ensure that it contained the same video footage the landlord showed Lieutenant Porfidio "and also on the ground previously regarding the business records affidavit. He may have gone through the system, but **in terms of actually maintaining the records, this officer was not in charge of doing that. That was the landlord**." (Tr. Vol. III at 67) (emphasis added). With this objection, Irwin put the trial court on notice that he was objecting to the Lieutenant's ability to authenticate the video in a manner that would render it admissible as a silent witness. Moreover, the trial court understood that Irwin had made such an objection because the court

stated: "This time I think there's been a sufficient authentication to warrant the admissibility of Exhibit Seventy-seven (77). The objection's overruled." (*Id*. at 68.) Because Irwin raised the objection to the admission of the Security Footage at trial that he presents on appeal, I disagree with the majority's conclusion that Irwin's argument is waived. *See*, *e.g.*, *Bush v. State*, 929 N.E.2d 897, 899 (Ind. Ct. App. 2010) (defendant's objection at trial was sufficient to preserve argument for appeal).

## 2. Security Footage's Admissibility

[31] I also disagree with the majority's conclusion that "the State provided sufficient evidence to authenticate the Security Footage." (Maj. op. at ¶ 15.) While my colleague notes there is no suggestion the Security Footage was manipulated, (J. Bailey concurring at ¶ 3), it is still the burden of the party proffering the evidence to prove its authenticity, not the burden of the opposing party to disprove authenticity. *See* Ind. Evid. R. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").

[32] The majority concludes Lieutenant Porfidio's testimony provided an adequate foundation for admission of the Security Footage because:

> (1) the security system was located in a locked room; (2) the landlord was the only person with access to that room; (3) the landlord did not alter the footage; (4) Lieutenant Porfidio downloaded the Security [sic] system on the day of the arrest; and (5) there was no way the Security Footage could have been

> manipulated when Lieutenant Porfidio downloaded it from the
> security system.

(Maj. op. at ¶ 15.)  However, the majority's analysis ignores that while Lieutenant Porfidio reviewed the Security Footage when the landlord showed it to him, the landlord was the one responsible for operating and maintaining the security system.  Lieutenant Porfidio did not testify regarding when the security system activated, whether the time-and-date stamp on the footage was accurate, or whether the system had proven itself to be reliable in the past.  Presumably, the landlord exercised control over the recording process in the operation of his business and could attest to the accuracy of the footage, but the State did not call the landlord as a witness.  Without testimony from a sponsoring witness who possessed such knowledge, I would hold the State failed to lay an adequate foundation for admission of the Security Footage and, therefore, the trial court abused its discretion by admitting it.  *See*, *e.g.*, *Stott v. State*, 174 N.E.3d 236, 246-47 (Ind. Ct. App. 2021) (photographs of surveillance footage were inadmissible when the sponsoring witness did not have knowledge of the security system, did not exercise control over the recording process, and could not attest to the accuracy of the footage).

[33]  While not noted in the majority opinion, I recognize that in *Kirby v. State* another panel of this court held that testimony from two investigating officers satisfied the authentication standard required for the admission under the silent-witness theory.  217 N.E.3d 575, 589 (Ind. Ct. App. 2023), *trans. denied*.  In that case, Kenneth Kirby set his sister's house on fire.  *Id*. at 579.  After the fire

department extinguished the fire, Kirby's sister showed police footage recorded by her backyard security camera. *Id*. at 580. Kirby's sister told the police that she would give them a copy of the footage, but she did not follow through on her promise and stopped cooperating with law enforcement. *Id*. The police were never able to obtain a copy of the backyard security camera footage. *Id*.

[34] At trial, the State sought to introduce testimony from the two investigating officers regarding their observations of the video, and Kirby objected pursuant to the silent-witness theory on the ground that the testifying officers did not lay a proper foundation for the authenticity of the video. *Id*. at 581. The trial court overruled Kirby's objection and admitted the officers' testimony. *Id*. The panel affirmed the trial court's admission of the officers' testimony and concluded the State laid an adequate foundation for the officers to testify regarding their observations from the video. *Id*. at 588. The panel noted the officers were able to testify regarding the placement of the cameras in the backyard and only a short period of time passed between when the arson occurred and the officer's review of the surveillance footage. *Id*. Kirby pointed out that one of the officers "admitted that he did not know 'the way the DVR operates'" and the second officer testified that he observed the timestamp on the video was inaccurate. *Id*. In rejecting Kirby's first concern, the panel noted that "home security cameras are widely accessible to the public and are not technically complicated to the average user. A lack of understanding regarding the inner mechanics of a home security DVR system does not necessarily render the footage stored therein

unreliable." *Id*. With respect to Kirby's second concern, the panel wrote that "it is not unheard of for a security camera's internal clock to be inaccurate." *Id*.

[35] I view *Kirby* as watering down the authentication threshold for admitting evidence under the silent-witness theory, and I think that is unwise. A technology's increasing prevalence and relative lack of complexity does not diminish our need to ensure that evidence derived from that technology is accurate. An authenticating witness must be familiar enough with a security system's operation to assure us of its accuracy even if the person cannot give a detailed description of precisely how the security system operates. This requires at least some familiarity with the particular security system that recorded the subject footage. *See*, *e.g.*, *McCallister v. State*, 91 N.E.3d 554, 562 (Ind. 2018) (hotel manager's testimony sufficiently authenticated security footage when the manager recognized the hotel's lobby in the footage, explained the process for ensuring the security system maintained an accurate time-and-date-stamp, explained the system recorded continuously, and explained how footage from the system could be retrieved).

[36] In addition, while the accuracy of the timestamp in *Kirby* was not particularly material, we should not disregard an inaccurate timestamp too readily. In the instant case, the State argued guests "coming at odd times of night" to Irwin's apartment was circumstantial evidence of drug dealing. (Tr. Vol. III at 128.) The reviewing officer in *Kirby* knew the timestamp was inaccurate because he reviewed the footage shortly after the events depicted in the footage, but if secondhand information from an investigating officer is all that is necessary to

authenticate security footage, the risk that an erroneous timestamp or like error will go undetected becomes increasingly likely, along with the associated risk that the State may rely on the error to obtain a conviction. Moreover, I find lowering the bar necessary to establish the authenticity of surveillance footage to be particularly unwise in an age when continuously evolving technology makes video manipulation easier. *See Stott*, 174 N.E.3d at 247 ("It is no secret that it is increasingly easier in today's digital age to manipulate or distort images."); *see also* Tonya Riley, *The Technology 202: New Video Editing Technology Raises Disinformation Worries*, Washington Post, June 10, 2019, https://perma.cc/JB6J-2V65. I am concerned the majority opinion in the instant case erodes that standard.

## 3. Harmless Error

[37] Nevertheless, "[a]n error is harmless when it results in no prejudice to the substantial rights of a party. The harmless-error analysis is a practical one[.]" *Hall v. State*, 177 N.E.3d 1183, 1197 (Ind. 2021) (internal quotation marks omitted). It requires reversal only when the trial court's errors "affect the essential fairness of the trial." *Id*. The improper admission of evidence is harmless if it is cumulative of other properly admitted evidence, and we will not reverse a conviction based on the improper admission of evidence if there is such substantial evidence of guilt that we are satisfied there is no substantial likelihood the challenged evidence contributed to the conviction. *Pelissier v. State*, 122 N.E.3d 983, 988 (Ind. Ct. App. 2019), *trans. denied*.

[38]     Here, Irwin challenges the trial court's admission of surveillance footage recorded by a stationary camera that was trained on the area outside of Irwin's apartment. The Security Footage showed substantial foot traffic to and from Irwin's apartment. It also showed Irwin wearing a red and black backpack and retrieving items from the backpack. These two facts are significant because Detective Patton testified that substantial foot traffic is indicative of drug trafficking and because, when police recovered the backpack while executing a search warrant at Irwin's apartment, it contained drugs, drug paraphernalia, and firearms. However, officers surveilled Irwin's apartment for three weeks prior to searching it. During this time, Detective Patton personally observed an uncommon number of visitors to Irwin's apartment, and Detective Patton saw Irwin carrying the red and black backpack. Thus, admission of the Security Footage was simply cumulative of Detective Patton's testimony.[1]

[39]     In addition, there was other substantial evidence of Irwin's guilt. During their period of surveillance, officers pulled over three vehicles leaving Irwin's apartment and discovered small quantities of methamphetamine during each of those traffic stops. Lawrence was one of the people the officers pulled over, and she told the officers Irwin was selling drugs out of his apartment. When the officers executed the search warrant at Irwin's apartment, they found

---

[1] The Security Footage did show guests arriving at Irwin's apartment at times when officers were not actively surveilling him. However, given Detective Patton's testimony that he observed substantial foot traffic to and from Irwin's apartment, the fact that such activity continued at times when officers were not actively watching Irwin was not particularly material.

methamphetamine, cocaine, fentanyl, marijuana, a large amount of cash, and drug paraphernalia. Thus, substantial evidence outside of the Security Footage demonstrated Irwin was dealing drugs. *See Ladd v. State*, 710 N.E.2d 188, 191 (Ind. Ct. App. 1999) ("circumstantial evidence of a defendant's intent to deliver, such as possession of a large quantity of drugs, large amounts of currency, scales, plastic bags, and other paraphernalia, as well as evidence of other drug transactions, can support a conviction"). Therefore, I would hold admission of the Security Footage was harmless error at most because it was cumulative of other evidence properly admitted and there was other substantial evidence of Irwin's guilt. *See*, *e.g.*, *Smith v. State*, 190 N.E.3d 462, 467 (Ind. Ct. App. 2022) (trial court's admission of testimony regarding cell phone records and cell phone location data was harmless at most because it was cumulative of other evidence and there was substantial other evidence of defendant's guilt), *reh'g denied*, *trans. denied*.

[40] I do not believe Irwin waived his objection that the State failed to sufficiently authenticate the surveillance footage, and I agree with Irwin that the State's foundation was insufficient. However, I do not believe we should reverse Irwin's convictions because of the substantial other evidence of Irwin's guilt. Therefore, I respectfully concur in result.